UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PIXON IMAGING, INC., a Delaware corporation; and PIXON IMAGING, LLC, a California limited liability company,<br><br>　　　　　　　　　　　　Plaintiffs,<br><br>　v.<br><br>EMPOWER TECHNOLOGIES CORP., a corporation organized under the laws of Canada; and EMPOWER TECHNOLOGIES, INC., a Washington corporation,<br><br>　　　　　　　　　　　　Defendants. | CASE NO. 11-CV-1093-JM (MDD)<br><br>**ORDER GRANTING PLAINTIFF'S *EX PARTE* APPLICATION FOR TEMPORARY RESTRAINING ORDER**<br><br>Doc. No. 12 |

　　　Plaintiffs Pixon Imaging, Inc. and Pixon Imaging, LLC (together, "Pixon") brought the instant action against Defendants Empower Technologies Corp. and Empower Technologies, Inc. (together, "Empower") based on Empower's alleged misappropriation of certain proprietary and confidential information. Pixon's complaint names seven causes of action for (1) breach of contract, (2) misappropriation of trade secrets, (3) conversion, (4) unfair competition, (5) unjust enrichment, (6) false advertising under § 43(a) of the Lanham Act, and (7) declaratory relief. (Doc. No. 1, "Complaint.") Pixon now brings an *ex parte* application for a temporary restraining order ("TRO") enjoining Empower from using or disclosing Pixon's proprietary information. (Doc. No. 12.)

## I.   BACKGROUND

Pixon is the author, creator, and owner of a technology that removes unwanted visual and audio data from video footage. For example, this technology (also known as the "Pixon Algorithms") allows users to eliminate the distorting effects of conditions such as fog, haze, and heat, thereby enhancing the detail, clarity, and contrast of the resulting images. Pixon markets its technology to customers through the sale of hardware boards linked with associated software. Pixon believes that its Algorithms represent the most advanced image enhancement technology in the world to date.

Pixon alleges that it began purchasing off-the-shelf hardware boards from Empower sometime in 2008, and subsequently entered into discussions with Empower regarding potential modifications to Pixon's software that would allow it to run on Empower's products. On or around July 3, 2008, the parties signed a non-disclosure agreement (the "NDA") to protect the confidentiality of the information Pixon was providing to Empower in the course of their discussions. Under the NDA, Empower was prohibited from disclosing Pixon's information or using it for any reason other than "evaluation and development purposes." (Doc. No. 12-1 p.4.) Subsequently, over the course of the next year or two, Pixon sent Empower a series of source code files, schematics, software, and other information that, taken together, comprised the entirety of "Pixon's core trade secrets." (Id.) According to Pixon, the totality of the information it sent to Empower over that period "provided Empower with the knowledge and capacity needed to create products based on Pixon's Algorithms." (Id.)

On or around October 1, 2009, soon after this transfer of information, the parties entered into an agreement for Empower to purchase Pixon outright (the "Purchase Agreement"). The Purchase Agreement provided that all of Pixon's proprietary information was to be kept confidential and returned to Pixon should Empower fail to close the transaction.

While Empower attempted to raise the funds necessary to complete its purchase of Pixon, Pixon continued to purchase hardware from Empower, including a transaction memorialized in a letter dated March 17, 2010 (the "March 17, 2010 Agreement") in which the parties agreed that Empower would retain ownership of certain products previously ordered

by Pixon (the "Deliverables"), including design drawings and source code, until Pixon had paid the invoice for those items.

Around July 2010, it became evident to the parties that Empower would be unable to raise the money it needed to close on the Purchase Agreement. Therefore, Pixon informed Empower on or around July 18, 2010 that it was no longer interested in completing the transaction. The parties thereafter entered into another letter agreement on August 23, 2010 (the "August 23, 2010 Letter") in order to settle any unresolved debts, including the amount owed on the invoice for the March 17, 2010 purchase order. However, Pixon alleges that, even after signing the August 23, 2010 Letter, Empower refused to return the Deliverables to Pixon as required by the March 17, 2010 Agreement. In addition, Empower refused to perform under the terms of the August 23, 2010 Letter, which provided, *inter alia*, that Empower acquire an equity share in Pixon.

A year later, Empower issued a press release in which it announced it would be launching a "new line of video and still imaging products based on Empower's proprietary real time Image Signal Correction (ISC) technology." (Doc. No. 12 Exh. G.) According to Empower, its ISC technology includes "high performance image processing software" that performs certain image enhancing functions:

> The proprietary high performance image processing software provides real-time dehazing, deblurring, dewarping, denoising, color and contrast enhancement functions utilizing the powerful Empower embedded computing hardware. . . . Empower's proprietary real time Image Signal Correction Technology reduces any fogged up image due to fog, smog, smoke, dust, rain, snow or heat waves to clarify any images enabling the monitor of the live situation to see clearly . . . .

(Id.) Subsequently, on April 11, 2011 and July 25, 2011, Empower announced it had signed deals to integrate its ISC technology into the products of several foreign companies. (Id. at Exhs. H & J.) Pixon also claims that it received separate confirmation from a different source that Empower has admitted its ISC technology specifically incorporates proprietary information obtained from Pixon.

Pixon filed suit in this court on May 18, 2011, and brought the instant *ex parte* application for a TRO on August 5, 2011. Empower opposes the request. (Doc. No. 14.) The

parties appeared before this court on August 22, 2011 and presented oral argument on the matter, which was thereafter taken under submission.

## II. LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy never awarded as of right. In each case, courts 'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.'" Winter v. Natural Res. Def. Council, 555 U.S. 7, 24 (2008) (quoting Amoco Prod. Co. v. Gambell, 480 U.S. 531, 542 (1987)). In order to demonstrate entitlement to preliminary injunctive relief, a party must establish four factors: (1) likelihood of success on the merits; (2) likelihood that she will suffer irreparable harm without such relief; (3) that the balance of equities tips in her favor; and (4) that an injunction is in the public interest. Id. at 20.

## III. DISCUSSION

### A. Likelihood of Success on the Merits

Pixon argues that it is likely to succeed on at least three of its claims, namely its causes of action for misappropriation of trade secrets, breach of contract, and declaratory relief.

#### 1. Misappropriation of trade secrets

##### a. Whether the Pixon Algorithms are "trade secrets"

CAL. CIV. CODE § 3426.1(d) defines a "trade secret" as

> information, including a formula, pattern, compilation, program, device, method, technique or process that:
>
> (1) Derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and
>
> (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Although the parties appear to agree that the Pixon Algorithms are information that "[d]erives independent economic value . . . from not being generally known," they dispute whether Pixon took reasonable steps to maintain the secrecy of those Algorithms. Empower claims that the Algorithms were provided to it "freely" and "without any demand for confidentiality" before the NDA was even signed. (Doc. No. 14 p.5.) According to Empower, this "[v]oluntary

dissemination" of the Algorithms "disqualifies [them] for trade secret protection." (Id.) However, Pixon denies that the pre-NDA information sent to Empower was anything more than "source code . . . that controlled certain standard video functions." (Doc. No. 23 p.2.) Rather, Pixon claims that the Algorithms in question were not disclosed to Empower until 2009. (Id.)

Regardless of what information Pixon released to Empower before signing the NDA and what information it released after, it seems apparent that at least *some* of that information was clearly intended to be confidential and protected by the parties' agreement and therefore would constitute a trade secret. Moreover, because the total body of information provided between 2008 and 2010 appears to be cumulative in nature, it is likely that, if Empower's ISC technology is indeed based on Pixon's Algorithms, some degree of trade secret misappropriation could be deemed to have occurred.

### b. Whether Empower's ISC technology is derived from the Pixon Algorithms

Empower further argues that, even if the Algorithms do qualify as trade secrets, it cannot be guilty of misappropriating them since Pixon cannot show that Empower's ISC technology is actually based on Pixon's work. (Doc. No. 14 pp. 6-8.) At the current stage, it appears that Pixon's belief that Empower has misappropriated its Algorithms is based primarily on two pieces of evidence: First, Pixon characterizes Empower as "a hardware and software manufacturing company [that] lacks the resources and capabilities to design complex image processing algorithms" similar to Pixon's own.[1] (Doc. No. 12-1 p.10) In spite of these limitations, however, the ISC technology described in Empower's press releases purports to perform functions that are identical or substantially similar to those of Pixon's Algorithms. Pixon also argues that the language of the press releases themselves tracks Pixon's own descriptions of its technology so closely that the two are likely to be describing the same

---

[1] See also Doc. No. 23 p.5 (describing Empower as "strictly a manufacturing company [that] does not have the research and development capabilities to independently develop technology that will perform the image correction functions described in [Empower's] press releases").

1    product. (Doc. No. 23 p.5.) According to Pixon, the only plausible explanation for how a
2    company like Empower could now purport to have such a technology in its possession is for
3    it to have taken the information directly from Pixon. Second, Pixon claims that Empower
4    explicitly informed one of its potential customers that its ISC technology directly incorporated
5    Pixon's technology. (Doc. No. 12-1 p.7.) A current Pixon employee, Ron Bauer, has submitted
6    a declaration confirming that, in May of 2011 he contacted Empower to express interest in
7    purchasing its ISC products.[2] (Doc. No. 12-6, "Bauer Decl.," ¶¶ 2-3.) According to Mr. Bauer,
8    in the course of his discussions with Empower, Empower's representatives directly confirmed
9    that Empower's products "used and incorporated Pixon's image enhancement technology."
10   (Bauer Decl. ¶¶ 3-4.)

11   Empower contends that its ISC technology is based not on Pixon's Algorithms, but on
12   two completely separate products manufactured by the companies Rohm Semiconductor and
13   Mintron Enterprise Co. (Doc. No. 14 p.7.) It argues that Pixon's software "is not the only
14   software on the market" for image correction, and that its own products were drawn from some
15   of these other software sources. However, Pixon claims that the technology from Rohm and
16   Mintron that Empower refers to is simply not capable of performing the suite of functions that
17   Empower has claimed its own ISC products can do; according to Pixon, its is the only
18   technology capable of "dewarping, deblurring, or denoising" video. (Doc. No. 23 p.4.)
19   Moreover, Pixon also argues that, to the extent that the underlying technology of Empower's
20   products is *not* similar to its own, Empower has nevertheless still committed trade secret
21   misappropriation by using its knowledge of Pixon's Algorithms as "negative know-how"—that
22   is, Empower used Pixon's Algorithms and the research underlying it as a basis for developing
23   a different product. (Id. at p.6.)

24   Given that there is no indication that Empower had or was in the process of developing
25   a similar product prior to the initiation of its relationship with Pixon in 2008, and given the
26   degree of similarity between Pixon's technology and the products now being marketed by
27
28   [2] At the time, Mr. Bauer was working for a different company, but he initiated contact with Empower at Pixon's request.

Empower, the court finds that there is a substantial likelihood that Empower's ISC technology is in fact derived from Pixon's Algorithms.

### c. Whether Empower was contractually permitted to make use of the Algorithms

Finally, Empower claims that, even if it had used Pixon's Algorithms in its own products, it was entitled to do so under the March 17, 2010 Agreement. (Doc. No. 14 p.7.) Pursuant to the terms of that Agreement, the Deliverables ordered by Pixon—products that Empower had designed around Pixon's Algorithms—would be considered Empower's property until such time as the invoice amount on those products was paid in full by Pixon. Empower argues that, because Pixon has not paid the invoice amount, it is permitted to sell the Deliverables to other buyers.

While Pixon agrees that it did not pay the invoice amounts due under the March 17, 2010 Agreement, it claims that it attempted to tender the payments to Empower in one of several ways. First, under the August 23, 2010 Letter, the parties agreed to a "[d]ebt conversion" provision under which Empower agreed to forgive a certain portion of Pixon's debt in exchange for an ownership interest in Pixon itself. (See Doc. No. 12 Exh. F.) Pixon claims that, by signing this Agreement, it "effectively tendered the invoice amount to Empower," but that Empower refused to sign the subsequent subscription agreement for the equity stake. (Doc. No. 12-1 p.13.) Second, Pixon claims that in April of 2011, it requested that Empower identify a specific sum that it believed would constitute full payment on the outstanding invoices, but that Empower refused to do so. Pixon subsequently sent Empower a check for $240,000 in an attempt to make that payment, but Empower returned the check uncashed.

Empower argues that the August 23, 2010 Letter was not in fact a final binding contract to resolve Pixon's debt, but merely a "[l]etter of [i]ntent," "subject to negotiation and execution of . . . a formal agreement." (Doc. No. 14 p.8.) Indeed, the subject header of the August 23, 2010 Letter describes the document as a "Working Letter Agreement For The Preparation Of Empower Pixon Imaging Investment Agreement as set forth in the last paragraph." The final

paragraph of the letter in turn states: "Finally, if we agree to the above terms, then we will put the above terms into a formal agreement . . . . The Agreement and all subsequent and any referenced agreements shall be contingent on approval by Empower and Pixon Imaging counsels as to terms and conditions . . . ." Thus, although confusingly worded, it does appear that the parties did not intend for the August 23, 2010 Letter to constitute the final agreement between the parties.[3] Moreover, Empower claims that it rejected Pixon's attempted $240,000 payment because there was, at the time, "a very real dispute as to the amount owed by Pixon to Empower." (Doc. No. 14-3, "Fraser Decl.," ¶ 4.)

The question of whether Empower had the contractual authority to sell Pixon's Algorithms to a third party thus relates directly to the question of Pixon's likelihood of success on the merits of its breach of contract claim, specifically with regard to the March 17, 2010 Agreement. This issue is addressed below.

### 2. **Breach of contract**

Pixon claims that, by making unauthorized use of its Algorithms and attempting to sell them, Empower has breached three separate contractual agreements: (1) the NDA, (2) the Purchase Agreement, and (3) the March 17, 2010 Agreement. (Doc. No. 12-1 pp.10-14.) Under a straightforward reading of the contractual language of the NDA and the Purchase Agreement, Empower would clearly be in breach if it has indeed used Pixon's confidential technology in order to develop and market its own products.[4] Therefore, the question is whether Pixon is also

---

[3] The first page of the August 23, 2010 Letter also contains the header "Without Prejudice," bold and underlined in the top right corner. While it is unclear precisely what this term refers to, it may be that the drafting party intended to indicate that the letter itself was not a final binding representation of the terms of the agreement.

[4] The NDA states in pertinent part:

> Unless otherwise expressly authorized by [Pixon], [Empower] agrees to retain the "Confidential Information" in confidence, not to disclose the received "Confidential Information" to any third party, and not to use the "Confidential Information" for any purpose other than the aforesaid evaluation and development purposes.

(Doc. No. 12 Exh. A ¶ 2.) Similarly, the Purchase Agreement states:

> [Empower] acknowledges that any information, materials and

likely to be able to show that Empower was not the rightful owner of the Algorithms and the Deliverables under the terms of the March 17, 2010 Agreement.

The fundamental dispute over the March 17, 2010 Agreement is not whether Pixon has paid off its invoices—Pixon acknowledges that it has not—but whether Pixon has made an adequate offer to tender payment that Empower has nevertheless refused to accept. As discussed above, Pixon claims it has made two attempts to pay Empower the amount owed: first, by signing the August 23, 2010 Letter and agreeing to pay Empower with an equity stake in Pixon; and second, by requesting Empower name the dollar figure owed, and then offering a check for $240,000 when Empower refused to state a specific amount that it believed would settle Pixon's debt.

At this point, it is unclear why the parties were unable to execute a final agreement based on the terms set forth in the August 23, 2010 Letter and resolve the issue of payment on Pixon's invoice. However, Pixon claims that it sent Empower two proposed agreements that would have effected the terms of the Letter, but that Empower refused to execute them.[5] (Doc. No. 23 p.7.) In addition, although Empower claims that it did not accept Pixon's $240,000 payment because there was some dispute as to the amount owed, it does not explain why it was

> documentation received or observed by it . . . is confidential. [Empower] shall take . . . all reasonable steps and precautions to protect and maintain the confidentiality of such information, materials and documentation . . . .
>
> If the purchase of the Business and Assets pursuant to this Agreement is not completed, [Empower] shall return to [Pixon] all materials, documentation, data, records, drawings and other papers and copies thereof . . . relating to the Assets or the Business which is confidential . . . and maintain the confidentiality of all such information or knowledge obtained from [Pixon], and not use any such information or knowledge for any purpose whatsoever.

(Id. at Exh. B ¶¶ 5.2-5.3.)

[5] As Pixon correctly notes, a contract to negotiate an agreement incorporates a covenant to negotiate in good faith. See Copeland v. Baskin Robbins U.S.A., 96 Cal. App. 4th 1251, 1260 (2002). If Empower refused to sign the final agreements based on the August 23, 2010 Letter because it decided it would rather retain ownership of Pixon's technology than accept payment on the invoice, this would be a clear violation of that covenant.

unable to provide Pixon with a figure that, in Empower's opinion, would have been sufficient.[6]

Based on the facts currently before the court, Pixon has made a substantial case that Empower improperly refused to accept Pixon's attempted invoice payments, such that Pixon has demonstrated a likelihood of success on its breach of contract claim.

### 3. Declaratory relief

Pixon seeks a declaration that Empower has breached its contracts with Pixon and that Pixon is the rightful owner of the Deliverables. (Doc. No. 12-1 p.14.) Therefore, the likelihood of Pixon's success on the merits of this claim is contingent upon the outcome of its breach of contract claim in which, as discussed above, Pixon has made an adequate showing that it is likely to prevail.

### B. Likelihood of Irreparable Harm

Pixon argues that it is likely to suffer irreparable harm because its "business success is based on the continuing secrecy of the Algorithms." (Id. at p.15.) Specifically, Pixon claims that its Algorithms represent the culmination of five years of the company's work; moreover, they are not currently protected by any patents, such that their disclosure would severely cripple if not completely destroy Pixon's future business prospects.[7] Pixon also argues that Empower likely does not have the resources to satisfy a monetary judgment against it, such that damages in the event that Pixon ultimately prevails are an inadequate remedy. On the other hand, Empower contends that "there is no showing that monetary damages are insufficient" (Doc. No. 14 p.9), although it does not offer any refutation of Pixon's claims regarding the inadequacy of its own monetary resources.

Because the Algorithms do appear to be vital to Pixon's business, and because the

---

[6] Empower now claims that Pixon owes it $390,480 and requests that Pixon post this amount as bond should the TRO be granted, although it is not clear why this figure was not available earlier. (Doc. No. 14 p.11.)

[7] Pixon also cites to district court case law holding that "[a]n intention to make imminent or continued use of a trade secret or to disclose it to a competitor will almost always show irreparable harm." Pac. Aerospace & Electronics, Inc. v. Taylor, 295 F. Supp. 2d 1188, 1198 (E.D. Wash. 2003) (quoting Campbell Soup Co. v. ConAgra, Inc., 977 F.2d 86, 92-93 (3d Cir. 1992)).

unauthorized release and sale of its technology by Empower would severely undermine Pixon's operations, the court concludes that Pixon has adequately demonstrated a likelihood of irreparable harm.

### C.     Balance of Equities

Pixon argues that the balance of equities is in its favor since Pixon is likely to suffer a severe hardship if Empower is permitted to make use of its trade secrets. Moreover, because Empower claims that the products it is marketing and selling are *not* based on or derived from Pixon's Algorithms, Pixon argues that, if this is indeed the case, Empower will not suffer any hardship because it will not be restrained from continuing its operations. (Doc. No. 12-1 p.17.) However, Empower contends that, even though it is innocent of any trade secret misappropriation, any preliminary injunction that issued against it would nevertheless damage Empower's goodwill and reputation in ways that could not be remedied by an award of damages. (Doc. No. 14 p.10.)

On balance, the reputational harms Empower claims it may suffer appear to be outweighed by the severity of the damage to Pixon's operations if its trade secrets are improperly used and disseminated. Therefore, the court finds the balance of the equities here lie in Pixon's favor.

### D.     Public Interest

Neither party squarely addresses the impact of granting an injunction on the public interest.[8] However, given the seriousness of Pixon's claims and the general public interest that is served by promoting the protection of trade secrets, the court believes it would be in the public interest to grant Pixon's TRO.

//

//

//

---

[8] Although Empower purports to do so in the section of its opposition entitled "PIXON DOES NOT SHOW THAT THE BALANCE OF EQUITIES AND PUBLIC INTEREST FAVORS IT," that section only addresses the balance of equities.

**IV. CONCLUSION**

For the reasons set forth above, the court hereby GRANTS Pixon's *ex parte* application for a temporary restraining order and orders the following:

1. Empower is prohibited from using, disclosing, selling, licensing, or otherwise capitalizing on Pixon's confidential and proprietary information, including the Pixon Algorithms or any Products or Work Products that Empower has developed or may develop in the future that incorporate, are based on, or are derived from the Pixon Algorithms or any other of Pixon's confidential and proprietary information. For purposes of this order, the following definitions apply:

    a) The "Pixon Algorithms" are defined as the algorithms and methods that Pixon developed to improve video and still images.

    b) The term "Products or Work Products" shall include, but is not limited to: algorithms, technical specifications, source code, software, hardware, still-image cameras, and video cameras.

2. The parties shall place into escrow the following:

    a) Empower:

        i) Any confidential and proprietary information, including the Pixon Algorithms, that Pixon provided to Empower; and

        ii) Any products or work products that Empower has developed which incorporate, are based on, or are derived from the Pixon Algorithms, including any source code, object code, or hardware and software design files.

    b) Pixon:

        i) $300,000 as a stand-in for the payments currently owing to Empower (although the court acknowledges that the actual amount owed is still disputed).

The escrow is to be administered by the company Iron Mountain, with any associated fees or costs to be split evenly between the parties.

3. Pixon is required to post a litigation bond in the amount of $100,000 within 48 hours of the issuance of this order.

4. Pursuant to Fed. R. Civ. P. 65(b)(2), this temporary restraining order shall remain in effect until **Wednesday, September 7, 2011** at **5:00pm**. In addition, a hearing on an extension of the TRO beyond this initial period is set for **Friday, September 2, 2011** at **2:00pm**. The court will determine at that time if good cause exists to extend the TRO for an additional 14 days. At the hearing, the parties may also stipulate to a longer extension of the TRO or, alternatively, for entry of a preliminary injunction, should they wish to do so.

**IT IS SO ORDERED.**

**DATED: August 24, 2011**

**Hon. Jeffrey T. Miller
United States District Judge**